IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| B.J.,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>G6 HOSPITALITY, LLC, et al.,<br><br>　　　　Defendants. | Case No. 22-cv-03765-MMC<br><br>**ORDER GRANTING MOTIONS TO DISMISS; DENYING AS MOOT MOTION TO STRIKE; AFFORDING PLAINTIFF LEAVE TO AMEND; CONTINUING CASE MANAGEMENT CONFERENCE** |

　　　　Before the Court are four motions, filed November 4, 2022: (1) Leisure Hotel Group LLC dba Clarion Inn's "Motion to Dismiss Plaintiff's Second Amended Complaint Under Rule 12(b)(6)" (see Dkt. No. 120 ("LMot.")); (2) Hilton Domestic Operating Company Inc.'s "Motion to Dismiss Plaintiff's Second Amended Complaint Under Rule 12(b)(6)," in which G6 Hospitality LLC, Interstate Management Company, LLC, and VWI Concord LLC dba Hilton Concord have joined (see Dkt. Nos. 123 ("HMot."), 126 ("GJoin"), 131 ("IJoin"), 152 ("VJoin")); (3) Marriott International, Inc. and Residence Inn by Marriott LLC's "Motion to Dismiss Plaintiff's Second Amended Complaint" (see Dkt. No. 124 ("MMot.")); and (4) Choice Hotels International, Inc.'s "Motion to Dismiss Plaintiff's Second Amended Complaint, or in the Alternative, Motion to Strike" (see Dkt. No. 125 ("CMot.")).[1]  Plaintiff B.J. has filed opposition to each motion (see Dkt. Nos. 132 ("LOpp."), 134 ("HOpp."),[2] 155 ("VOpp."), 135 ("MOpp."), 133 ("COpp.")), to which

---

[1] One additional defendant, Concord Inn and Suites LP dba Studio 6 Concord, has filed an answer.  (See Dkt. No. 159.)

[2] B.J.'s opposition to Hilton Domestic Operating Company, Inc.'s motion also applies to two defendants that joined in said motion, namely, G6 Hospitality LLC and

defendants have replied (see Dkt. Nos. 146 ("LRep."), 144 ("HRep."), 149 ("GJoinRep."); 147 ("IJoinRep."), 157 ("VJoinRep."), 148 ("MRep."), 145 ("CRep.")).  Having read and considered the papers filed in support of and in opposition to the motions, the Court rules as follows.[3]

## BACKGROUND[4]

Between 2012 and 2016, plaintiff B.J. was "trafficked for commercial sex and suffered severe physical and emotional abuse under duress" at five California hotels: (1) Studio 6 Concord ("Studio 6"), (2) San Ramon Marriott, (3) Residence Inn Pleasant Hill – Concord ("Residence Inn Concord"), (4) Clarion Hotel Concord/Walnut Creek ("Clarion Hotel"), and (5) the Hilton Concord (collectively, "the hotels").  (See SAC ¶¶ 5, 7.)  Studio 6 is operated by defendant Concord Inn and Suites LP ("Concord Inn"), a franchisee of defendant G6 Hospitality, LLC ("G6").  (See SAC ¶ 12.)  The San Ramon Marriott is owned and operated by defendant Marriott International, Inc. ("Marriott").  (See SAC ¶ 14.)  The Residence Inn Concord is operated by defendant Residence Inn by Marriott LLC ("Residence Inn"), a franchisee of Marriott.  (See SAC ¶ 15.)  The Clarion Hotel is operated by defendant Leisure Hotel Group LLC ("Leisure"), a franchisee of defendant Choice Hotels International, Inc. ("Choice").  (See SAC ¶ 17.)  The Hilton Concord is operated by defendant VWI Concord LLC ("VWI"), a franchisee of defendant Hilton Domestic Operating Company, Inc. ("Hilton"), and is managed by defendant Interstate Hotels and Resorts, Inc. ("Interstate").  (See SAC ¶¶ 19, 20.)[5]

"B.J. met her trafficker through Facebook[,]" (see SAC ¶ 39), and, the trafficker,

---

Interstate Management Company, LLC.

[3] By order filed March 10, 2023, the Court took the matter under submission.

[4] The following facts are taken from the allegations of the operative complaint, the Second Amended Complaint ("SAC").

[5] For purposes of this Order, the Court refers to defendants G6, Marriott, Choice, and Hilton as "the Franchisor Defendants," and refers to Residence Inn, Leisure, VWI, and Interstate as "the Franchisee Defendants."

2

"[u]nder the guise of seeking a romantic partnership," promised B.J. "shelter, support, and a better life." (See SAC ¶ 39.) In particular, after "learn[ing] [B.J.] had been trafficked as a minor and was in the process of being evicted from her home," B.J.'s trafficker "preyed on her vulnerable position and coerced B.J. to meet him so he could help take care of her and her kids while they fought the eviction." (See SAC ¶ 40.) "What followed were years of physical, sexual, and psychological abuse designed to control B.J. and prevent her escape from sexual servitude carried out at the hotels owned, operated, supervised, and/or branded by defendants." (See SAC ¶ 40.) "B.J.'s trafficker imposed a strict and cruel 'quota' system," whereby "he forced B.J. to be sold to enough buyers that she earned his stated daily minimum which varied from day to day." (See SAC ¶ 41.) If B.J. failed to meet the daily quota, "it rolled over to the next day," and she "was not allowed to leave the hotel rooms in which she was trafficked for any reason, including to see and look after her children and feed herself[.]" (See SAC ¶ 41.)

B.J. alleges defendants "ignore[d] the open and obvious signs and presence of commercial sex trafficking on their properties and in the hotels[,]" including signs of B.J.'s trafficking (see SAC ¶ 3), took no action to ensure B.J.'s safety (see SAC ¶¶ 51, 60, 62, 67, 70, 72, 78, 82, 86, 88, 90), and instead "profited from the sex trafficking of B.J. and knowingly or negligently aided and engaged with her trafficker in his sex trafficking venture" by "renting rooms to B.J.'s traffickers"[6] that defendants "kn[ew], or should have known, that [the traffickers] were using . . . to harbor sex trafficking victims, physically assault them, and subject them to repeated exploitation as they [were] forced into sexual servitude" (see SAC ¶¶ 338-39).

Based on the above allegations, B.J. asserts as against each defendant causes of action under, respectively, the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595, and the California Trafficking Victims Protection Act

---

[6] Given the SAC's interchangeable use of the singular and plural forms of "trafficker," the number of individuals engaged in the subjugation of B.J. is unclear.

("CVPTA"), Cal. Civ. Code § 52.5.

## LEGAL STANDARD

Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990). Rule 8(a)(2), however, "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). Consequently, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." See id. Nonetheless, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than . . . a formulaic recitation of the elements of a cause of action." See id. (internal quotation, citation, and alteration omitted).

In analyzing a motion to dismiss, a district court must accept as true all material allegations in the complaint and construe them in the light most favorable to the nonmoving party. See NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986). "To survive a motion to dismiss," however, "a complaint must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "Factual allegations must be enough to raise a right to relief above the speculative level," Twombly, 550 U.S. at 555, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation," see Iqbal, 556 U.S. at 678 (internal quotation and citation omitted).

## DISCUSSION

By the instant motions, defendants seek an order dismissing the above-titled action in its entirety, on the asserted ground that B.J. has not stated a claim for relief against them under either the TVPRA or the CVPTA.

**A. CVTPA**

At the outset, plaintiff, in each of her oppositions to the instant motions, "concedes"

4

the CVTPA claim should be dismissed as against all moving and joining defendants. (See LOpp. at 1 n.1, HOpp. at 1 n.2, VOpp. at 1 n.2, MOpp. at 1 n.1, COpp. at 1 n.1.) Accordingly, the Court turns to the question of whether B.J. has stated a claim under the TVPRA.

**B. TVPRA**

The Trafficking Victims Protection Reauthorization Act "creat[es] criminal offenses for forced labor and sex trafficking[,]" see J.C. v. Choice Hotels Intl.' Inc., 2020 WL 6318707, at *3 (N.D. Cal. Oct. 28, 2020); see also 18 U.S.C. § 1591,[7] and, in addition to the criminal prohibition, "provides sex-trafficking victims with a civil cause of action," see Doe #1 v. Red Roof Inns, Inc., 21 F.4th 714, 723 (9th Cir. 2021), against both the perpetrator of the trafficking and those who benefit therefrom, as follows:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

See § 1595(a).

To state a § 1595(a) claim under a beneficiary theory, a plaintiff must allege facts plausibly establishing that the defendant(s) "(1) knowingly benefitted (2) from participation

---

[7] The criminal provision of the TVPRA provides criminal penalties for:

(a) Whoever knowingly –

    (1) . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

    (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in a n act described in violation of paragraph (1),

knowing . . . that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act[.] See 18 U.S.C. § 1591.

in a venture (3) that they knew or should have known has engaged in trafficking the plaintiff." See J.M. v. Choice Hotels Int'l, Inc., 2022 WL 10626493, at *2 (E.D. Cal. Oct. 18, 2022) (internal quotation and citation omitted). "A plaintiff may satisfy these elements in one of two ways." See H.G. v. Inter-Cont'l Hotels Corp., 489 F. Supp. 3d 697, 704 (E.D. Mich. 2020). Specifically, such plaintiff may "show that the defendant's own acts, omissions, and state of mind establish each element[,]" i.e., that such defendant is directly liable under the statute, or "impute to the defendant the acts, omissions, and state of mind of the agent of the defendant[,]" i.e., that the defendant is indirectly, or vicariously, liable under the statute. See id.

Here, B.J. advances both direct and vicarious theories of liability under § 1595. In particular, she advances a direct theory of liability against Marriott and the Franchisee defendants, and vicarious theories of liability against the Franchisor Defendants. Defendants contend B.J. fails to allege sufficient facts to support the elements of a TVPRA claim under any theory. The Court first turns to B.J.'s direct beneficiary liability claims.

### a. Direct Beneficiary Liability Claims

Although the SAC contains allegations purporting to establish the direct liability of every moving and joining defendant as a beneficiary of B.J.'s trafficking, B.J., in her oppositions to the Franchisor Defendants' motions to dismiss, concedes her direct liability claims as to Hilton, G6, and Choice (see HOpp. at 12:9-12, COpp. at 7:2-5) and also concedes her direct liability claim against Marriott to the extent it acted as a franchisor of the Residence Inn Concord (see MOpp. at 8:1-2). B.J. maintains her direct liability claim against Marriott with respect to the trafficking that allegedly occurred at the San Ramon Marriott, however, because, according to B.J., the San Ramon Marriott was "owned, managed, and operated by the national corporation, Marriott International . . . [u]nlike the franchisor/franchisee relationship seen in other hotel operations in this case[.]" (See

MOpp. at 9:26-27; see also MOpp. at 8:1-2, SAC ¶ 56.)[8]  The Court considers below B.J.'s remaining direct liability claims, namely, said claim against Marriott and her claims against the Franchisee Defendants.

### 1.  Knowingly Benefit

"The 'knowingly benefit' element of section 1595 merely requires that [the] [d]efendant knowingly receive a financial benefit[,] and the rental of a room (or [the defendant's] receipt of royalties for that rental) constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element." J.C., 2020 WL 6318707, at *4 (internal quotation and citation omitted).

Here, B.J. alleges, Marriott "receives a percentage of the gross room revenue for the money generated by the operations of all Marriott hotels, including a percentage of the rate charged for the rooms in which [B.J.] was trafficked at the San Ramon Marriott[.]" (See SAC ¶ 13-v; see also SAC ¶¶ 14-iv, 226, 338, 340.)  B.J. makes essentially the same allegations as to each of the Franchisee defendants.  (See SAC ¶¶ 15 iv-v, 17 iv-v, 19 vi-vii, 20 vi-vii.)  The Court finds B.J.'s allegations, at the motion to dismiss stage, sufficient to satisfy this element.

### 2.  Participation in a Venture

"The phrase 'participation in a venture' requires that the [plaintiff] allege that [the defendants] took part in a common undertaking or enterprise involving risk and potential profit."  Red Roof Inns, 21 F.4th at 725; see also J.M., 2022 WL 10626493, at *4 (same).  Although plaintiffs are "not required to allege an overt act in furtherance of or actual knowledge of a sex trafficking venture in order to sufficiently plead [a] section 1595 civil liability claim[,]" see B.M. v. Wyndham Hotels & Resorts, Inc., 2020 WL 4368214, at *3 (N.D. Cal. July 30, 2020), they must, at the very least, "connect the dots between [the

---

[8] In its reply, Marriott disputes this allegation, noting that "a 'brand' does not operate a hotel and [Marriott] did not own or operate the San Ramon Marriott."  (See MRep. at 8:26-27.)  For purposes of this motion, however, the Court accepts B.J.'s allegations as true.  See NL Indus., 792 F.2d at 898.

alleged sex trafficking and [the] defendants[,]" see id. at *5, e.g., by a "showing of a continuous business relationship between the trafficker and the defendant such that it would appear that the trafficker and the defendant have established a pattern of conduct or could be said to have a tacit agreement[,]" see J.B. v. G6 Hospitality, LLC, 2020 WL 4901196, at *9 (N.D. Cal. Aug. 20, 2020) (internal quotation, citation, and alteration omitted); see also, e.g., Ricchio v. McLean, 853 F.3d 553, 555 (1st Cir. 2017) (finding participation sufficiently pled where plaintiff alleged trafficker "had prior commercial dealings with [defendants], which the parties wished to reinstate for profit").

Here, B.J. alleges Marriott and the Franchisee Defendants each took part in a "sex trafficking venture" (see SAC ¶¶ 13(viii), 14(v), 15(vi), 17(vi), 19(viii), 20(viii)) or a "venture which it [k]new or should have known to engage in sex trafficking" (see SAC ¶¶ 13(vii)(I), 14(iii), 15(v), 17(v), 19(vii), 20(vii)). The question thus presented is whether B.J. has plausibly alleged that Marriott and the Franchisee Defendants "took part in the common undertaking of sex trafficking with hotel employees, management, owners, and sex traffickers." See Red Roof, 21 F.4th at 726. The Court finds B.J. has failed to do so.

At the outset, the Court finds unpersuasive B.J.'s attempt to frame the "ventures" in which Marriott and the Franchisee Defendants allegedly participated as "general" ventures, as opposed to "sex trafficking" ventures. (See MOpp. at 7:21-23, LOpp. at 6:16-19, HOpp. at 8:15-18, VOpp. 7:12-15.) Although B.J., in her oppositions, asserts said defendants each "participated in a general venture because they partook in a common undertaking or enterprise . . . involving risk and potential profit" (see MOpp. at 7:23-24, LOpp. at 6:17-19, HOpp. at 8:16-18, VOpp. at 7:13-15), namely, the management and operation of the hotel properties at which B.J. was allegedly trafficked, such argument is at odds with the SAC, which refers only to "sex trafficking venture[s]" (see, e.g., SAC ¶¶ 13(viii), 14(v), 15(vi), 17(vi), 19(viii), 20(viii)) or ventures defendants "[k]new or should have known to engage in sex trafficking" (see e.g., SAC ¶¶ 13(vi)(i), 13(vii)(i), 14(iii), 15(v), 17(v), 19(vii), 20(vii)). It is well settled that B.J. may not amend the SAC through her briefs. See Dang. V. Samsung Elecs. Co., 2018 WL 11348883, at *7

(N.D. Cal. July 2, 2018) (holding "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss" (internal quotation and citation omitted)). Moreover, even if the Court were to accept the "general venture" assertion articulated for the first time in B.J.'s oppositions, such assertion would not suffice to plead a violation of the TVPRA. See Red Roof, 21 F.4th 725 (holding "the third element of the [plaintiff's] claim is that the venture in which the defendant participated and from which it knowingly benefited must have violated the TVPRA as to the plaintiff").

Next, the Court finds B.J. has failed to plausibly establish either Marriott's or the Franchisee Defendants' participation in a sex trafficking venture. In that regard, B.J. alleges hotel staff affirmatively enabled her trafficking by taking the following actions: housekeeping staff at the at the San Ramon Marriott "acknowledged and aided [her] trafficking by providing additional supplies to her trafficker" (see SAC ¶ 61); front desk staff at the Residence Inn Concord "readily complied" with her trafficker's request for an extra room key "so he could enter the room B.J. had locked him out o[f]" (see SAC ¶ 71); housekeeping staff at the Clarion Inn "aided B.J.'s trafficking by providing an inordinate amount of supplies, including linens, sheets, and cleaning agents" (see SAC ¶ 79); and front desk staff at Hilton Concord "informed the trafficker of B.J.'s location when she attempted to hide from him and seek refuge from the hotel" (see SAC ¶ 89).[9] Even assuming the conduct of the above-referenced hotel staff could be imputed to Marriott and the Franchisee Defendants as operators of their respective hotel properties, such allegations do not suggest hotel employees engaged in conduct outside the scope of their ordinary responsibilities, let alone any kind of "tacit agreement" with B.J.'s trafficker to engage in the alleged sex trafficking venture. See J.B., 2020 WL 4901196, at *9.

Under such circumstances, the Court finds B.J. has not plausibly alleged the "participation in a venture" element of her TVPRA claim.

---

[9] In alleging Hilton Concord staff "informed the trafficker of B.J.'s location" (see SAC ¶ 89), B.J. does not allege any such employee was aware of her efforts to hide and/or seek refuge from anyone.

9

### 3. Knew or Should Have Known the Venture was Engaged in Trafficking

To establish the knowledge element of her TVPRA claim, B.J. need only assert facts supporting defendants' constructive knowledge of the sex trafficking venture in which it allegedly participated, i.e., that defendants "rented rooms to people they knew or should have known were engaging in sex trafficking."  See B.M., 2020 WL 4368214 at *5.  The Court finds B.J. has failed to make such a showing.

B.J. alleges Marriott and the Franchisee Defendants ignored various "open and obvious signs" of commercial sex trafficking at their hotel properties (see, e.g., SAC ¶¶ 3, 37), and, in support thereof, points to instances wherein her trafficker abused her, or otherwise exhibited evidence of her trafficking in public areas of defendants' hotel properties (see, e.g., SAC ¶¶ 68, 74, 70, 72 (alleging B.J.'s trafficker, during stays at Residence Inn Concord, "collected payments from B.J.'s buyers in . . . public areas"; "repeatedly and conspicuously [stood] outside of B.J.'s window and filmed while she was forced to perform commercial sex acts with buyers"; "knock[ed] and hammer[ed] on the door for hours on end demanding to be let in"; and, on one occasion, "dragged B.J. through the hotel, spat in her face, and assaulted B.J. while she screamed");  ¶¶ 81-82 (alleging B.J.'s trafficker, during stays at Clarion Hotel, "often physically attacked her in public areas of the hotel[,]" which assaults were "coupled with degrading commentary and criticism for not meeting her 'quota' of buyers that day or meeting it too quickly[,]" and, when B.J. escaped her room, "chased her in [hotel] public space"); ¶ 90 (during stay at Hilton Concord, "B.J.'s trafficker grabbed B.J. . . . in the public common area of the [hotel]" in a manner that "left visible, hand-shaped bruises on B.J.'s arms")).[10]  B.J. does not, however, allege any hotel employees witnessed the above-described episodes, and, absent allegations to that effect, fails to plausibly establish defendants "should have known" of B.J.'s trafficking.  See B.M., 2020 WL 4368214 at *5.

Although the SAC does contain allegations that hotel employees witnessed other

---

[10] The SAC contains no similar allegations as to the San Ramon Marriott.

events, those allegations, as set forth below, likewise are insufficient to establish defendants' actual or constructive knowledge of trafficking.

B.J. alleges, for example, that, "[o]n more than one occasion, the San Ramon Marriott housekeeping staff observed B.J.'s buyers violently attack her" (see SAC ¶ 62) and "[o]n another occasion . . . witnessed a buyer swiftly depart B.J.'s room in a state of complete undress" (see SAC ¶ 63); that "housekeeping staff at the Clarion Hotel . . . entered B.J.'s room while she was being sold or preparing to be sold for commercial sex" (see SAC ¶ 80);[11] and that "Hilton Concord's hotel staff[12] observed . . . B.J. being escorted into and out of rooms by as many as eight buyers in any given day" (see SAC ¶ 87). Such allegations, however, are equally consistent with criminal conduct other than sex trafficking, e.g., prostitution.

Where alleged conduct has "two possible explanations, only one of which can be true and only one of which results in liability . . . [s]omething more is needed, such as facts tending to exclude the possibility that the alternative explanation is true." See Petzschke v. Century Aluminum Co. (In re Century Aluminum Co. Sec. Litig.), 729 F.3d 1104, 1108 (9th Cir. 2013); see also, e.g., J.B., 2020 WL 4901196, at *11 (noting "allegations that [TVPRA] victim sought help and was seen by [hotel] employees with physical injuries or other facts suggesting coercion allow courts to infer that . . . hotel employees should have known that human trafficking was occurring, as opposed to other criminal conduct").[13] Here, the requisite "something more" is missing, and, consequently,

---

[11] Although B.J. also alleges that, during a stay at the Clarion Hotel, she "screamed for help" after her trafficker "became enraged and cornered [her] in her room" (see SAC ¶ 82), she does not allege facts suggesting any member of the hotel staff could have heard her.

[12] The SAC contains no similar allegation as to the Residence Inn Concord.

[13] To the extent B.J., in opposing the instant motions, makes reference to other "obvious signs" of sex trafficking, at defendants' hotels, namely, "an excess of condoms, persons carrying large amounts of cash, [the] declining of room service, men traveling with multiple women, guests checking in with little or no luggage" (see LOpp. at 9:13-15, HOpp. 11:20-22, VOpp. 5:3-6, MOpp. at 10:8-11), as well as "large amounts of cash being stored in rooms; [individuals] renting two rooms next to one another; . . . significant foot traffic; . . . women who were known to be staying in rooms without leaving; . . . hotel

11

1  the Court finds B.J. has not plausibly established Marriott's or the Franchisee

2  Defendants' actual or constructive knowledge of their participation in a TVPRA-violating

3  venture.

4        Accordingly, B.J.'s direct TVPRA claims against Marriott and the Franchisee

5  Defendants are subject to dismissal.

**b. Vicarious Liability**

7        B.J. seeks to hold the Franchisor Defendants vicariously liable for their

8  franchisees' alleged violations of § 1595 under both actual and apparent agency theories.

9  As to Marriott, Choice, and Hilton, these claims necessarily fail because, as set forth

10  above, B.J. has failed to state a claim for direct liability against their respective

11  franchisees.  As discussed below, however, the Court will afford B.J. leave to amend,

12  and, in light thereof, the Court next addresses the Franchisor Defendants' arguments that

13  they cannot be held vicariously liable under the TVPRA for the conduct of their

14  franchisees.

15        At the outset, the Court finds unpersuasive the contention by two of the Franchisor

16  Defendants, namely, Marriott and Choice, that, "[b]ecause there is no language in the

17  TVPRA extending secondary or vicarious liability in this context, [B.J.'s] attempts to imply

18  vicarious liability . . . should be rejected." (See CMot. At 14:24-26; see also MMot. at

19  17:28-18:5.)  "Although the TVPRA does not explicitly address the issue of vicarious

20  liability, statutes are presumed not to disturb the common law, unless the language of the

21  statute is clear and explicit for this purpose[,]" see J.M., 2022 WL 10626493, at *5

22  (internal quotation and citation omitted), and where, as here, the "federal statute does not

23  provide direction, the Ninth Circuit has applied the federal common law of agency[,]"

24  specifically, "agency principles from the Restatement (Third) of Agency[,]" see id.; see

---

guests preventing women or others from speaking for themselves; and one guest controlling another's identification documents" (see HOpp. at 6:7-11), none of those "signs" is alleged to have been observed at any of defendants' hotels (see SAC ¶ 112), and, consequently, the Court has not considered them.

1  also, e.g., J.C., 2020 WL 6318707, at *8 (rejecting argument that TVPRA does not

2  provide for agency liability; noting TVPRA's "silen[ce] on the issue of indirect liability . . .

3  suggests that the federal common law of agency should apply" (internal quotation and

4  citation omitted)); A.B. v. Hilton Worldwide Holdings, Inc., 484 F.Supp.3d 921, 939 (D. Or.

5  2020) (examining "vicarious liability [under the TVPRA] as a question of federal common

6  law").

7        The Court next addresses the Franchisor Defendants' contention that B.J. has not

8  pled facts showing an actual or apparent agency relationship between the Franchisor

9  Defendants and their franchisees.

### i. Actual Agency Relationship

An actual agency relationship requires "(1) a manifestation by the principal that the agent shall act for him; (2) that the agent has accepted the undertaking; and (3) that there is an understanding between the parties that the principal is to be in control of the undertaking." See Sun Microsystems, Inc. v. Hynix Semiconductor, Inc., 622 F. Supp. 2d 890, 899 (N.D. Cal. 2009) (citing Restatement (Third) of Agency § 1.01 (2006)).  When determining whether a principal has sufficient authority to control the actions of an agent, such that the principal may be held vicariously liable for the agent's actions, the Ninth Circuit considers the following non-exhaustive list of factors:

> 1) the control exerted by the employer, 2) whether the one employed is engaged in a distinct occupation, 3) whether the work is normally done under the supervision of an employer, 4) the skill required, 5) whether the employer supplies tools and instrumentalities, 6) the length of time employed, 7) whether payment is by time or by the job, 8) whether the work is in the regular business of the employer, 9) the subjective intent of the parties, and 10) whether the employer is or is not in business.

See U.S. v. Bonds, 608 F.3d 495, 504 (9th Cir. 2010); see also Restatement (Third) of Agency § 7.07 cmt. f (identifying factors useful in evaluating whether principal exercises sufficient control over agent's work to establish vicarious liability); Jones v. Royal Admin Servs., Inc., 887 F.3d 443, 450 (9th Cir. 2018) (holding "the extent of control exercised by

13

1  the principal is the essential ingredient" (internal quotations, citation, and alteration
2  omitted)).

3        "While a franchisor-franchisee relationship does not necessarily create an agency
4  relationship . . . a franchisor may be held liable for a franchisee's actions if the franchisor
5  controls the franchisee's day-to-day operations." J.M., 2022 WL 10626493, at *5 (finding
6  allegations in complaint sufficient to show agency relationship where plaintiff "allege[d]
7  defendants exercised control over the day-to-day operations of the hotels by hosting
8  online bookings, setting hotel employee wages, making employment decisions for the
9  hotels, providing standardized training methods for hotel employees, and fixing hotel
10 room rent prices"). In particular, courts focus on the franchisor's control over the
11 "instrumentality, the conduct, or the specific aspect of the franchisee's business that
12 caused the alleged injury." See Patterson v. Domino's Pizza, LLC, 60 Cal. 4th 474,
13 498-499 (2014) (internal quotations and citations omitted) (holding franchisor could not
14 be held vicariously liable for sexual harassment of franchisee employee where franchisor
15 lacked "day-to-day authority over matters such as hiring, firing, direction, supervision, and
16 discipline of the [harassing] employee" (internal quotation and citation omitted)).

17       Here, B.J. alleges, the Franchisor Defendants "exercise[] control over [their
18 respective franchisees] with respect to many issues regarding the day-to-day operation of
19 the property, but also specifically with regard to the [franchisee's] policy on human
20 trafficking" (see SAC ¶¶ 257, 278, 299, 318), and, in support thereof, states:

> [t]he agency relationship [between Franchisor Defendants and their respective franchisees] was created through [Franchisor Defendants'] exercise of an ongoing and systematic right of control over [their] franchised hotels, beyond that which is necessary to maintain brand standards, by [Franchisor Defendants'] operations, including the means and methods of how [their] hotels conducted business through one or more of the following actions: (i) hosting online bookings on [their] domain[s]; (ii) requiring [franchisee] hotels to use [franchisors'] customer rewards program[s]; (iii) setting employee wages; (iv) making employment decisions; (v) advertising for employment; (vi) sharing profits; (vii) standardized training methods for employees; (viii) building and maintaining . . . facilit[ies] in a

> manner specified by the owner; (ix) standardized or strict rules of operation; (x) regular inspection of the facility and operation by owner; (xi) fixing prices; or (xii) developing uniform and consistent policies regarding the prevention of commercial sex trafficking at brand properties, including a risk management process to identify, prevent, and mitigate risks for commercial sex trafficking; and (xiii) other actions that deprive [franchisee] hotels of independence in business operations"

(see SAC ¶ 266; see also SAC ¶¶ 287, 306, 329). B.J.'s "use of the modifier 'one or more[,]'" however, "strips these allegations of any force." See H.G., 489 F.Supp.3d at 708; see also L.H. v. Marriott Int'l, Inc., 604 F. Supp. 3d 1346, 1362 (S.D. Fla. 2022) (same). "While [B.J.] lists [thirteen] ways [the Franchisor] Defendants *may* exercise control," she "does not say *which one*" or more of the listed forms of control the Franchisor Defendants allegedly use, see H.G., 489 F.Supp.3d at 708 (emphases in original), and, consequently, her allegations are "far too uncertain and vague to plausibly establish that [the Franchisor] Defendants controlled the franchisees' operations to such an extent that the franchisees were [Franchisor] Defendants' agents[,]" see id.

Similarly uncertain is the following allegation:

> [The Franchisor Defendants} may exercise or could have exercised control over [their franchisees] by: (i) distributing information to assist employees in identifying human trafficking; (ii) providing a process for escalating human trafficking concerns within the organization; (iii) requiring employees to attend training related to human trafficking; (iv) providing new hire orientation on human rights and corporate responsibility; (v) providing training and education to the local hotel through webinars, seminars, conferences, and online portals; (vi) developing and holding ongoing training sessions on human trafficking; or (vii) providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

(See SAC ¶ 265; see also SAC ¶¶ 286, 305, 325.) B.J.'s use of "may exercise" or "could have exercised" control again provides no meaningful description of any Franchisor

Defendant's involvement in the daily operations of its franchisee.[14]

Next, B.J.'s conclusory allegations that each Franchisor Defendant "controls the training, procedures, and policies for its brand hotels" (see SAC ¶¶ 11(ii), 13(ii), 16(ii), 18(ii)) and requires franchises to comply with its brand standards (see SAC ¶¶ 11(iii), 13(iii), 16(iii), 18(iii)) are, absent factual support, unavailing, see Iqbal, 556 U.S. at 678. To the extent B.J. has provided more detail, however (see SAC ¶¶ 284, 304, 327 (alleging franchisees are required to provide specified services and products)), those allegations "tend[] to show that the franchisors' involvement was limited to uniformity and standardization of the brand[,]" see S.J. v. Choice Hotels Int'l, Inc., 473 F. Supp. 3d 147, 156 (E.D.N.Y. 2020), which has been found insufficient to establish the requisite degree of control for an agency relationship. See id.; see also Cislaw v. Southland Corp., 4 Cal.App.4th 1284, 1295 (1992) (holding "[a] franchisor must be permitted to retain such control as is necessary to protect and maintain its trademark, trade name and good will, without the risk of creating an agency relationship with its franchisees").[15]

Lastly, B.J.'s allegation that the Franchisor Defendants may "kick delinquent hotels

---

[14] To the extent B.J., in her opposition, contends the Franchisor Defendants "required employees to attend training related to trafficking" (see HOpp. at 18:11-12; see also MOpp. at 16:21-22, COpp. 13:6-7), her argument is unavailing, as the SAC is devoid of any allegation that any such training was mandatory at any hotel in the period during which plaintiff was allegedly trafficked. Cf. Lomeli v. Jackson Hewitt, Inc., 2018 WL 1010268, at *6 (C.D. Cal. Feb. 20, 2018) (finding allegations sufficient to plead franchisor's vicarious liability for franchisee's preparation of fraudulent tax returns; noting franchisor "required franchisee employees to go through a background check, and participate in training programs developed by [franchisor], which were specifically designed to prevent the type of harm alleged by [plaintiff]").

[15] To the extent B.J., in her opposition, argues the Franchisor Defendants exerted control over the Franchisee Defendants, in that they "provide[] franchised/branded hotels with brand wide central reservation systems, 800 numbers, [and] revenue management tools[,]" and "control[] booking and room reservations" (see HOpp. at 17:24-25, MOpp. at 16:10-11, COpp. 12:23-24), her argument is unavailing, as the SAC is devoid of any allegation to such effect, and instead, makes only mention as to the value of "hotel brands" in general (see SAC ¶¶ 251-253); with respect to the Franchisor Defendants specifically, B.J. alleges only that they "can see booking and reservation trends, including for those hotels where [B.J.] was trafficked" (see SAC ¶ 253).

16

1  out of [their] system[s]" (see SAC ¶¶ 272, 293, 312, 332) does not establish an agency
2  relationship, as "[t]he right to terminate a franchise agreement should the franchisee not
3  follow mandatory procedures is generally insufficient to establish the requisite control[,]"
4  see Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC, 975 F. Supp. 2d 392, 410
5  (S.D.N.Y. 2013) (internal quotation and citation omitted); see also, e.g., Taggart v.
6  Rutledge, 657 F. Supp. 1420, 1440 (D. Mont. 1987), aff'd, 852 F.2d 1290 (9th Cir. 1988)
7  (distinguishing franchisor's "right to terminate . . . franchise agreement if it disapproves of
8  [franchisee's] practices" from "evidence . . . to support . . . claims that [franchisor] has any
9  control over [franchisee's] operations"); Cain v. Shell Oil Co., 944 F. Supp. 2d 1251, 1255
10 (N.D. Fla. 2014) (holding franchisor's "right to terminate the agreement . . . in no way
11 establishes a right to control the store's operations"); In re Motor Fuel Temperature Sales
12 Practices Litig., 2012 WL 1536161, at *5 (D. Kan. Apr. 30, 2012) (holding "rights such as
13 the right to enforce standards [and] the right to terminate the agreement for failure to
14 meet standards . . . does not amount to sufficient control" (internal quotation and citation
15 omitted)).

Accordingly, to the extent B.J.'s claim against the Franchisor Defendants is based on actual agency, such claim is subject to dismissal.

### ii. Apparent Agency Relationship

"To establish liability based on apparent agency, plaintiff must show manifestations by the [d]efendants led her to believe that the hotels were agents of the respective [d]efendants, and that [p]laintiff relied on that belief when engaging with the hotels." See A.B., 484 F.Supp.3d at 941 (citing Restatement (Third) of Agency § 2.03 (2006)). Here, although B.J. alleges the Franchisor Defendants hold out their franchisees to the public as possessing authority to act on their behalf (see SAC ¶¶ 267, 288, 307, 330), B.J. has not alleged she relied on any representation made by the Franchisor Defendants. Moreover, as Marriott points out, "the factual core of the entire SAC—that criminals trafficked B.J. in various hotels against her will—is incompatible with the notion that B.J. somehow relied" on the Franchisor Defendants' representations. (See MRep. at

12:26-28 (internal quotation omitted)); see also A.B., 484 F.Supp.3d at 942 (finding plaintiff "failed to allege the elements of apparent authority" where "[p]laintiff's claim [was] premised on the notion that she was taken to the hotels against her will to be sex trafficked").

Accordingly, to the extent B.J.'s claim against the Franchisor Defendants is predicated on apparent agency, such claim is subject to dismissal.[16]

## CONCLUSION

For the reasons stated above, defendants' motions to dismiss are hereby GRANTED and B.J. is hereby afforded leave to amend.[17]  Plaintiff's Third Amended Complaint, if any, shall be filed no later than June 12, 2023; B.J. may not, however, add any new defendants or new claims, without first obtaining leave of court.  See Fed. R. Civ. P. 15(a)(2).

In light of the above, the Case Management Conference currently set for June 23, 2023, is hereby CONTINUED to September 1, 2023.

**IT IS SO ORDERED.**

Dated: May 19, 2023

MAXINE M. CHESNEY
United States District Judge

---

[16] In light of this finding, the Court does not address herein Choice's motion to strike various allegations in the SAC.

[17] Although B.J. has amended twice before, neither amendment was predicated on an order of dismissal.